**LITE DEPALMA GREENBERG & AFANADOR, LLC**
Laura K. Mummert
Steven J. Greenfogel
1515 Market Street, Suite 1200
Philadelphia, PA 19102
(267) 314-7980
lmummert@litedepalma.com
sgreenfogel@litedepalma.com

[Additional Counsel on Signature Page]

*Attorneys for Plaintiffs and the Putative Class*

## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SAMUEL HERNANDEZ DIAZ and LANE POZIVIAK, *individually and on behalf of all others similarly situated*, | : : : : | Case No.: |
| *Plaintiffs*, | : : | **JURY TRIAL DEMANDED** |
| v. | : : | |
| BOWTECH, INC.; HOYT ARCHERY, INC.; MATHEWS ARCHERY, INC.; PRECISION SHOOTING EQUIPMENT, INC.; BPS DIRECT, LLC D/B/A BASS PRO SHOPS; CABELA'S LLC; DICK'S SPORTING GOODS, INC.; JAY'S SPORTING GOODS, INC D/B/A JAY'S SPORTING GOODS; KINSEY'S OUTDOORS, INC.; LANCASTER ARCHERY SUPPLY, INC.; ARCHERY TRADE ASSOCIATION, INC.; TRACKSTREET, INC.; and NEUINTEL LLC, D/B/A PRICESPIDER HOLDINGS LLC F/K/A ORIS INTELLIGENCE, | : : : : : : : : : : : : : : : : | **COMPLAINT -- CLASS ACTION** |
| *Defendants*. | : : : | |

Plaintiffs Samuel Hernandez Diaz and Lane Poziviak, on behalf of themselves and all

others similarly situated, upon personal knowledge as to the facts pertaining to themselves and

upon information and belief as to all other matters, and based on the investigation of counsel, bring this class action complaint against Archery Trade Association, Inc. ("ATA"), BPS Direct, LLC d/b/a Bass Pro Shops ("Bass Pro Shops"), Bowtech, LLC ("Bowtech"), Cabela's LLC ("Cabela's"), Dick's Sporting Goods, Inc. ("Dick's Sporting Goods"), Hoyt Archery, Inc. ("Hoyt"), Jay's Sporting Goods, Inc. d/b/a Jay's Sporting Goods ("Jay's"), Kinsey's Outdoors, Inc. ("Kinsey's"), Lancaster Archery Supply, Inc. ("Lancaster"), Mathews Archery, Inc. ("Mathews"), NeuIntel LLC, d/b/a PriceSpider f/k/a Oris Intelligence ("Oris"), Precision Shooting Equipment, Inc. ("PSE"), and TrackStreet, Inc. ("TrackStreet") (collectively "Defendants"), and named and unnamed co-conspirators, for violations of state and federal antitrust laws, seeking actual damages, treble damages, disgorgement of profits, injunctive relief, a declaratory judgment, reasonable costs and attorneys' fees, and pre- and post-judgment interest.

## NATURE OF CASE

1.      Consumers are entitled to the benefits of robust competition among Archery Product[1] manufacturers, distributors, and retailers. In a competitive market, that rivalry should lower prices. Defendants, however, have built a system designed to suppress those natural market forces. In their own words, the goal is to "eliminate the race to the bottom." Through coordinated adoption and enforcement of Minimum Advertised Price ("MAP") policies, Defendants have exchanged nonpublic and competitively sensitive information and used that information to align pricing strategies across the Archery Product market. Rather than responding to market pressures by lowering prices or offering discounts, Defendants have used MAP enforcement tools and trade association infrastructure to ensure that prices for Archery Products remain artificially high.

---

[1] As used in this Complaint and defined further herein, "Archery Products" includes: (1) various types of bows and their components; (2) arrows and associated parts (excluding arrowheads); (3) arrowheads; (4) target systems; and (5) accessories.

2.      The result is a market in which Archery Product prices are no longer determined by competition, but by the coordination of Defendants.

3.      The Archery Product market in the United States is substantial and growing. Millions of Americans participate in archery for sport, recreation, and hunting, resulting in the demand for high-quality archery gear to steadily increase. In recent years, the industry has seen a surge in product development and retail expansion, with manufacturers, distributors, and retailers alike capitalizing on the sport's rising popularity. Consequently, the number of consumers purchasing Archery Products nationwide continues to grow.

4.      At the same time, the cost of Archery Products has escalated dramatically, placing a growing financial burden on Plaintiffs and other consumers. Industry surveys and consumer reports indicate that Archery Products have become increasingly unaffordable for many enthusiasts, with some products now routinely priced in excess of $1,000.

5.      These price increases are not the result of natural market forces, but rather the product of a coordinated effort by Defendants to suppress competition and maintain supracompetitive pricing across the Archery Product supply chain.

6.      Archery Products manufacturers, Defendants Bowtech, Hoyt, Mathews, and PSE (collectively "Manufacturer Defendants"), and Archery Product retailers or distributors, Defendants Bass Pro Shops, Cabela's, Dick's Sporting Goods, Kinsey's, and Lancaster (collectively "Retailer and Distributor Defendants"), have submitted and continue to submit competitively sensitive information to the Archery Trade Association ("ATA") and its affiliated platforms. This nonpublic and material data includes, among other things, wholesale and retail pricing, sales and marketing strategies, output, and sales performance metrics.

7.     The ATA collects this competitively sensitive information from Manufacturer, Retailer, Distributor Defendants and other industry participants and disseminates it through various means, including the ATA Retail Trend Tracker Survey, ATA Connect, the ATA Retail Growth Interact Channel, My ATA Network Channel, and the MAP Resource Library. These platforms allow Manufacturer, Retailer, and Distributor Defendants to access insights into their competitors' pricing strategies, inventory levels, and more.

8.     But the ATA does more than just provide "informational resources" to Manufacturer, Retailer, and Distributor Defendants. The ATA actively encourages uniform MAP adoption and enforcement, monitors compliance, and facilitates collective pressure to eliminate discounting and promotional pricing. Through its Retail Council and Board of Directors— populated by representatives from competing manufacturers, retailers, and distributors—the ATA has urged members to align pricing strategies and eliminate "race-to-the-bottom" competition. Manufacturer, Retailer, and Distributor Defendants have also effectively outsourced their pricing discipline to the ATA and its affiliated software vendors, Defendants TrackStreet and Oris (collectively "Software Defendants"), which provide automated MAP enforcement tools and violation tracking.

9.     By sharing competitively sensitive information and coordinating pricing enforcement through the ATA, Manufacturer, Retailer, and Distributor Defendants have eliminated the "guessing game" of market competition. Instead of competing on price, they have agreed to maintain artificially inflated prices for Archery Products in accordance with their MAP policies, to the detriment of Plaintiffs and other consumers nationwide.

10.     By enforcing MAP policies, Defendants' conduct constitutes a per se violation of antitrust law because direct competitors entered into a horizontal agreement to fix, raise, maintain, or stabilize prices.

11.     From at least January 1, 2014 through the present (the "Conspiracy Period"), Defendants engaged in this conspiracy to fix, raise, maintain, or stabilize the prices of Archery Products sold throughout the United States. This Complaint is brought to prevent Defendants from continuing to engage in, or attempting to engage in, the anticompetitive conduct described herein.

12.     This action is brought under the Sherman and Clayton Acts. Plaintiffs bring this action on behalf of themselves and all others similarly situated to redress the injuries sustained from Defendants' unlawful conduct. As a direct and proximate result of Defendants' conspiracy to suppress price competition across the Archery Products industry, Plaintiffs and members of the proposed Classes paid artificially inflated prices for Archery Products. Plaintiffs seek damages, restitution, disgorgement, civil penalties, injunctive and other equitable relief, and recovery of costs and attorneys' fees under federal and state law.

## THE PARTIES

**A. Plaintiffs**

13.     **Plaintiff Samuel Hernandez Diaz** is a natural person, resident, and citizen of the State of California. During the Conspiracy Period, Plaintiff Hernandez Diaz purchased Archery Products that were manufactured by one or more of the Manufacturer Defendants and sold by one of the Retailer Defendants. These Archery Products were subject to MAP policies. Plaintiff Hernandez Diaz intends to continue purchasing Archery Products.

14.     **Plaintiff Lane Poziviak** is a natural person, resident, and citizen of the State of Pennsylvania. During the Conspiracy Period, Plaintiff Poziviak purchased Archery Products that

were manufactured by one or more of the Manufacturer Defendants and sold by one of the Retailer Defendants. These Archery Products were subject to MAP policies. Plaintiff Poziviak intends to continue purchasing Archery Products.

### B. Manufacturer Defendants

15.    **Defendant Bowtech, Inc.** is a Delaware corporation with its principal place of business in Eugene, Oregon. Bowtech manufactures and sells Archery Products in the United States. During the Conspiracy Period, Bowtech was a member of the Archery Trade Association ("ATA"), sold Archery Products subject to Minimum Advertised Price ("MAP") policies, and participated in a conspiracy to fix, raise, maintain, or stabilize the prices of Archery Products sold in the United States.

16.    **Defendant Hoyt Archery, Inc.** is a corporation organized and existing under the laws of Utah with its principal place of business in Salt Lake City, Utah. Hoyt manufactures and sells Archery Products throughout the United States. During the Conspiracy Period, Hoyt was a member of the ATA, sold Archery Products subject to MAP policies, and participated in a conspiracy to fix, raise, maintain, or stabilize the prices of Archery Products in the United States.

17.    **Defendant Mathews Archery, Inc.** is a corporation organized and existing under the laws of Wisconsin with its principal place of business in Sparta, Wisconsin. Mathews manufactures and sells Archery Products throughout the United States. During the Conspiracy Period, Mathews was a member of the ATA, sold Archery Products subject to MAP policies, and participated in a conspiracy to fix, raise, maintain, or stabilize the prices of Archery Products in the United States.

18.    **Defendant Precision Shooting Equipment, Inc.** is a corporation organized and existing under the laws of Delaware with its principal place of business in Tucson, Arizona. PSE

manufactures and sells Archery Products throughout the United States. During the Conspiracy Period, PSE was a member of the ATA, sold Archery Products subject to MAP policies, and participated in a conspiracy to fix, raise, maintain, or stabilize the prices of Archery Products in the United States.

### C. Retailer and Distributor Defendants

19.    **Defendant BPS Direct, LLC d/b/a Bass Pro Shops** is a limited liability company organized and existing under the laws of Delaware with its principal place of business in Springfield, Missouri. Bass Pro Shops sells Archery Products nationwide. During the Conspiracy Period, Bass Pro Shops was a member of the ATA, sold Archery Products subject to MAP policies, and participated in a conspiracy to fix, raise, maintain, or stabilize the prices of Archery Products in the United States.

20.    **Defendant Cabela's LLC** is a limited liability company organized and existing under the laws of Delaware with its principal place of business in Sidney, Nebraska. Cabela's was acquired by Bass Pro Shops in 2017. Prior to its acquisition and during the Conspiracy Period, Cabela's sold Archery Products nationwide, was a member of the ATA, sold Archery Products subject to MAP policies, and participated in a conspiracy to fix, raise, maintain, or stabilize the prices of Archery Products in the United States.

21.    **Defendant Dick's Sporting Goods, Inc.** is a corporation organized and existing under the laws of Delaware with its principal place of business in Coraopolis, Pennsylvania. Dick's sells Archery Products throughout the United States. During the Class Period, Dick's was a member of the ATA, sold Archery Products subject to MAP policies, and participated in a conspiracy to fix, raise, maintain, or stabilize the prices of Archery Products in the United States.

22.    **Defendant Jay's Sporting Goods, Inc.** is a corporation organized and existing under the laws of Michigan with its principal place of business in Clare, Michigan. Jay's sells Archery Products throughout the United States. During the Class Period, Jay's was a member of the ATA, sold Archery Products subject to MAP policies, and participated in a conspiracy to fix, raise, maintain, or stabilize the prices of Archery Products in the United States.

23.    **Defendant Kinsey's Outdoors, Inc.** is a corporation organized and existing under the laws of Pennsylvania with its principal place of business in Mount Joy, Pennsylvania. Kinsey's sells Archery Products throughout the United States. During the Class Period, Kinsey's was a member of the ATA, sold Archery Products subject to MAP policies, and participated in a conspiracy to fix, raise, maintain, or stabilize the prices of Archery Products in the United States.

24.    **Defendant Lancaster Archery Supply, Inc.** is a corporation organized and existing under the laws of Pennsylvania with its principal place of business in Lancaster, Pennsylvania. Lancaster operates a retail and e-commerce business and describes itself as a leading worldwide distributor of Archery Products. During the Class Period, Lancaster was a member of the ATA, sold Archery Products subject to MAP policies, and participated in a conspiracy to fix, raise, maintain, or stabilize the prices of Archery Products in the United States.

**D. Trade Association Defendant**

25.    **Defendant Archery Trade Association** is a corporation organized and existing under the laws of Virginia with its principal place of business in New Ulm, Minnesota. The ATA is a trade association whose membership includes manufacturers, wholesalers, and retailers of Archery Products. During the Class Period, ATA facilitated the exchange of nonpublic, competitively sensitive information among the Manufacturer, Distributor, and Retailer Defendants

and actively participated in a conspiracy to fix, raise, maintain, or stabilize the prices of Archery Products in the United States.

### E. Software Defendants

26.    **Neuintel LLC d/b/a PriceSpider f/k/a Oris Intelligence** is a corporation organized and existing under the laws of California with its principal place of business in Irvine, California. Oris developed and provided software used by Defendants to monitor and enforce MAP policies on Archery Products. During the Class Period, Oris participated in a conspiracy to fix, raise, maintain, or stabilize the prices of Archery Products in the United States.

27.    **Defendant TrackStreet, Inc.** is a corporation organized and existing under the laws of Delaware with its principal place of business in Las Vegas, Nevada. TrackStreet developed and provided software used by Defendants to monitor and enforce MAP policies on Archery Products. During the Class Period, TrackStreet participated in a conspiracy to fix, raise, maintain, or stabilize the prices of Archery Products in the United States.

### JURISDICTION AND VENUE

28.    **Subject Matter Jurisdiction.** This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337(a), as this action arises under Sections 1 and 3 of the Sherman Antitrust Act, 15 U.S.C. §§ 1, 3, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a), 26.

29.    **Personal Jurisdiction.** This Court has personal jurisdiction over each Defendant because they have purposefully availed themselves of the privilege of transacting business in the United States, including this District; have substantial contacts within the United States, including this District; and are engaged in a conspiracy that is aimed at causing, and has caused harm to

individuals and businesses residing, located, or operating in the United States, including this District.

30.    **Venue.** Venue is proper in this District under 15 U.S.C. §§ 15, 22 and 28 U.S.C. § 1391(b), (c). During the Conspiracy Period, one or more Defendants transacted business, were found, or had agents in this District. A substantial part of the events giving rise to Plaintiffs' claims occurred in this District, and a substantial portion of the affected interstate trade and commerce was carried out in this District.

31.    **Interstate Commerce.** Defendants' conduct, as alleged herein, substantially and foreseeably affected interstate commerce in the United States, including in this District. Defendants sell the Archery Products and their services in the continuous and uninterrupted flow of interstate commerce, including in this District.

## FACTUAL ALLEGATIONS

### A.  The Archery Product Market

32.    The relevant product market is the Archery Product Market. This relevant product market includes: (1) bows—such as compound bows, recurve bows, longbows, and crossbows— and their associated components; (2) arrows and their components, including shafts, fletching, and nocks (excluding arrowheads); (3) arrowheads, including broadheads and field points; (4) targets, including foam, bag, and three-dimensional (3D); and (5) accessories and enhancements such as sights, scopes, stabilizers, bow cases, and quivers. These products are used in archery and bowhunting.

33.    The relevant geographic market is the United States. Archery Products are distributed to customers throughout the United States.

34.     The Archery Products Market in the United States is substantial and growing. The ATA estimated in 2020 that there were 9.9 million bowhunters, 17.6 million recreational archers, and 5.4 million competitive archers.

35.     According to market researchers, "the United States archery equipment market size reached US$ 1.1 Billion in 2022" and is expected to grow to "$1.6 [b]illion by 2028."

36.     Archery Products are typically sold through a two-tiered distribution system.

37.     Retailers either purchase directly from manufacturers or through intermediaries known as distributors. Large multi-channel retailers, including national sporting goods chains, and specialty archery shops commonly source Archery Products directly from manufacturers. Smaller retailers often rely on distributors to source their Archery Products. Retailers then sell the Archery Products to consumers.

38.     Archery Products are expensive. According to a 2023 ATA report, only 7% of bows sold to consumers cost less than $300, while 28% bows were priced between $300 and $600, 16% between $600 and $900, 23% between $900 and $1,200, and 19% exceeded $1,200.

39.     Necessary accessories for bows are costly too. Arrows can cost over $100 for a six-pack, while arrowheads are often priced around $40 for a three-pack. Targets vary widely in price, ranging from approximately $50 to hundreds of dollars, depending on size, material, and design.

**B.  The ATA: the Central Facilitator of the Price-Fixing Conspiracy**

40.     During the Conspiracy Period, the Archery Trade Association ("ATA") served as the central coordinating entity for Defendants' price-fixing conspiracy.

41.     The ATA is the leading trade association for the United States archery industry. Eighty percent of its members include manufacturers, distributors and retailers of Archery Products (hereinafter "Supply Chain ATA Members")—many of which are horizontal competitors.

42.     Since 2000, the number of ATA members has grown from 505 to over 2,500 in 2023. During the Conspiracy Period, Manufacturer, Distributor, and Retailer Defendants were ATA members.

43.     To join the ATA, a potential member must complete an online application: (1) collects detailed company information, such as business name, address, contact details, year established, subsidiaries, and owner name; (2) collects financial data like annual sales volume; (3) requires the potential member to identify whether they plan to exhibit at the ATA Trade Show and designate a voting representative; and (4) requires potential members to upload verification documents, including government registration (e.g., business license, articles of incorporation, or tax registration), and may also require potential members to upload additional material such as invoices from suppliers, photos of the "shop," and a digital presence (website or social media).

44.     An ATA membership grants access to exclusive benefits.

45.     One benefit is that Supply Chain ATA Members can attend the annual ATA Trade Show. According to the ATA, it is the largest trade event in the archery and bowhunting industry. It "attracts archery professionals from across the world to connect[ and] build relationships. . . ."

46.     Another benefit is that Supply Chain ATA Members can search and connect with manufacturers, distributors, retailers, and service providers using a filterable Member Directory, and can engage in peer-to-peer collaboration online via ATA Connect or in person at ATA events.

47.     Other benefits include the Retail Trend Tracker Survey that Supply Chain ATA Members can download from its website. This survey is conducted quarterly and allows Supply Chain ATA Members to "gain insight from retailers across the country to help members adapt to changing conditions regionally as well as to compare your business to what is happening

nationally." The survey keeps Supply Chain ATA Members aware of trends and "provide[s] them with data to help guide future decision-making.

### 1.  The ATA's MAP Policy

48.    A Minimum Advertised Price ("MAP") policy is a pricing rule set by a manufacturer that prohibits its retailers and distributors from advertising a product below a specified minimum price. While retailers may technically sell products below the MAP price, they are prohibited from publicly promoting or displaying those lower prices in print or online. This limitation creates an effective price floor that limits consumer access to discounted prices.

49.    The ATA's Board of Directors, Retail Council, annual Trade Show, and members-only platform "ATA Connect" collectively provided Defendants with repeated opportunities to coordinate and implement MAP policies for Archery Products—shielded from consumer oversight and public scrutiny.

### 2.  The ATA Board of Directors

50.    The ATA is governed by a 20-member Board of Directors, representing Archery Product manufacturers, distributors, and retailers.

51.    Any "regular" member company, which includes Supply Chain ATA Members, may nominate its CEO or another member of its leadership team for election to the Board. While individuals are elected, the seat belongs to the company, allowing the member company to appoint a replacement should the elected individual leave, ensuring continuity of representation.

52.    The Board Directors serve in staggered four-year terms. Throughout the Conspiracy Period, Manufacturer, Distributor, and Retailer Defendants held seats on the ATA Board Directors despite being actual or potential competitors. For example, all Manufacturer and

Distributor Defendants served on the Board of Directors between 2018-2019; while Retailer Defendants served on the Board of Directors in 2015.

53.    The Board of Directors oversees critical ATA functions: approving bylaws, enforcing the Code of Conduct, sanctioning board-level initiatives like Minimum Advertised Price ("MAP") policy, overseeing the ATA Trade Show, and setting strategic direction, serving as a centralized forum where competitors can align on pricing, marketing, and advocacy actions.

### 3.  The ATA's Retail Council

54.    In May 2016, the Board of Directors reestablished the ATA's "Retail Council" as a strategic initiative to "provide more guidance and support to the organization's retail members," and to "improve the industry's archery and bowhunting markets." The Council is composed of representatives from major retailers, including Retailer Defendants.

55.    Mark Copeland, General Manager of Defendant Jay's Sporting Goods and Chair of the Retail Council, emphasized the Council's role is fostering collective action among retailers: "We've needed an active and engaged platform for retailers to discuss important issues where the conversation is educational and productive. I'm appealing to every archery retailer to use our backbone to step up and be part of the solution."

56.    The Retail Council and meets monthly to "address retailing issues," "discuss pressing issues related to the ATA's strategic planning efforts," and "all industry happenings." One discussed issue is the adoption and enforcement of MAP policies. Kurt Smith, the ATA's Director of Industry Relations for the Retail Council, has described MAP policies as "probably one of the most talked about topics in the archery industry." He has advised retailers to rigorously enforce MAP policies to ensure that "distributors and retailers [can] catch violators

[and] cut them out of the supply chain and force them to look for easier prey." These statements underscore the Council's role in coordinating MAP enforcement across the industry.

57.    Other Retail Council members have echoed this sentiment, advocating for industry-wide MAP compliance. One member stated that manufacturers "should create MAP policies and retailers should honor them," adding that "every business must work together as a group to be productive and profitable, which includes strong MAP policies and procedures." Another warned that "disobeying MAP policies . . . can have big consequences." These statements reflect a shared understanding among competitors that MAP enforcement is not merely a unilateral policy choice, but a collective strategy to suppress price competition and maintain elevated retail margins.

**4.  The ATA's Trade Show**

58.    The ATA hosts its annual members-only Trade Show, described on its website as "the largest trade show in the industry," attracting Supply Chain ATA Members including Manufacturer, Retailer, Distributor Defendants.

59.    The ATA Trade Show serves as a major gathering point for horizontal competitors across all levels of the Archery Products supply chain. The event draws thousands of participants each year. For example, the 2016 Trade Show was attended by representatives from over 1,100 manufacturers, retailers, and distributors companies, with "every major bow manufacturer was present and accounted for."

60.    MAP policies are openly and regularly discussed at the Trade Show. At the 2015 ATA Trade Show, approximately 60 representatives from ATA-member manufacturers, distributors, and retailers convened to review and discuss a sample MAP/MPR policy. These discussions provided opportunities for competitors to align on pricing enforcement strategies and to collectively pressure non-compliant members.

61.    These discussions continued at the 2016 ATA members-only Trade Show. There, horizontal competitors discussed why unity was needed on MAP policies behind closed doors.

62.    Mark Copeland, General Manager of Defendant Jay's Sporting Goods, member of the ATA Board of Directors from 2014 to 2022, and the ATA Retail Council Chair, stated: "The Trade Show is the one place where nearly everyone in our industry does business. It provides the perfect opportunity for retailers to talk face to face with Retail Council members." He further noted that retailers that are "in the trenches every day" could use the Trade Show to influence policy via the ATA Board.

**5.    ATA Connect**

63.    In November 2017, ATA created the online platform "ATA Connect" to serve as a private, members-only discussion space for Archery Product manufacturers, distributors, and retailers.

64.    The ATA promoted coordination between horizontal competitors through ATA Connect. The ATA advertised that the platform "helps" Archery Product manufacturers, distributors, and retailers to "build peer connections and talk regularly with like-minded business owners."

65.    In official communications promoting the platform, ATA encouraged members to engage in particular types of communications with their horizontal competitors, stating: "work with your peers to find solutions that boost business and benefit the industry by tackling topics like MAP policies, buying patterns, and setting appropriate charges for service work."

66.    ATA emphasized that the Retail Growth Interact—a sub-community within ATA Connect—was "created specifically for ATA-member retailers" and described it as a "safe online space for discussing topics like MAP policies."

67.    ATA also created another sub-community within ATA Connect called My ATA Network. The ATA promoted this sub-community by stating: "Distributors, manufacturers, retailers and other ATA members have different business goals, objectives and operations. That's why the ATA is creating My ATA Network, an open forum that helps all ATA members work together to grow archery and bowhunting participation while boosting their businesses."

## C. MAP Policies in the Archery Market Were Widespread, Coordinated, and Enforced Through Joint Mechanisms

68.    Since at least January 1, 2014, Defendants have engaged in a coordinated scheme to artificially inflate, fix, maintain, or stabilize the prices of Archery Products sold throughout the United States. Acting in concert, the Manufacturer, Distributor, and Retailer Defendants—through and with the facilitation of the ATA and Software Defendants—jointly adopted and strictly enforced MAP policies for Archery Products. These MAP policies functioned as de facto price floors, eliminating price competition and ensuring that retail prices remained at supracompetitive levels. The intended and actual effect of this conspiracy was to suppress market forces and extract inflated prices from consumers during the entirety of the Class Period.

### 1. Early Industry Concerns and the Emergence of MAP Discussions

69.    Beginning in the early 2000s and continuing through the following decade, members of the ATA, particularly retailers, began voicing growing concern over intensifying retail price competition in the Archery Products market. As price transparency increased, especially with the rise of e-commerce, ATA members gradually viewed this competition as a threat to profit margins and long-term viability. In response, discussions emerged within the ATA regarding the use of MAP policies as a mechanism to curb discounting and elevate retail prices. Although a limited number of MAP policies existed in the industry at the time, they were sporadic,

inconsistently enforced, and lacked the collective support necessary to influence market-wide pricing.

70.    Initially, the Archery Products industry was fragmented, with manufacturers, distributors, and retailers lacking a unified strategy to address downward pricing pressure. Some manufacturers expressed interest in adopting and enforcing MAP policies, but only on the condition that their competitors would do the same. Without coordinated enforcement, any single manufacturer that imposed MAP restrictions risked losing market share to rivals who allowed discounting. Likewise, retailers could exploit these inconsistencies by promoting lower-priced products from manufacturers without MAPs, thereby undercutting those who adhered to pricing restrictions. This dynamic created a classic collective action problem that could only be resolved through industry-wide coordination.

71.    In September 2010, the President of the National Archery Buyers Association publicly acknowledged the fragmented state of the Archery Products industry with respect to pricing discipline. Speaking to *Inside Archery*, a trade publication focused on the archery supply chain, he remarked: "Frankly, many manufacturers don't have a clue about minimum advertised pricing and why the industry needs it to survive. Consequently, we don't have much conformity in our industry."

72.    Due to this lack of consensus, retail price competition remained vigorous throughout the early 2010s. Although interest in MAP policies was growing among manufacturers, distributors, and retailers, efforts to expand their use were tempered by legal uncertainty. Industry participants recognized that coordinated adoption and enforcement of MAP policies could raise antitrust concerns. Indeed, a 2010 Inside Archery article noted that "[a]lthough some manufacturers and retailers ask the [ATA] to step in and make dealers and online retailers adhere

to MAPs, that would exceed the ATA's authority." One member of the ATA's Board of Directors candidly admitted, "There's nothing the ATA can legally do when it comes to enforcement. There's no rule the ATA can set down and say 'This is what you must do.'"

**2.    The ATA's Shift Toward Coordinated MAP Enforcement**

73.    By 2014, mounting pressure from ATA members had reached a tipping point. Industry participants increasingly demanded that the ATA take a more active role in curbing retail price competition and stabilizing margins across the Archery Products market in the United States. This pressure campaign culminated in the appointment of Retailer Defendants Cabela's and Bass Pro Shops to the ATA Board of Directors.

74.    Their inclusion marked a pivotal shift in the ATA's posture: from passive observer to active facilitator of coordinated pricing policies. Following their appointment, the ATA adopted a firm position that all members should implement and enforce MAP policies.

75.    With two of the largest Archery Products retailers now occupying leadership roles within the organization, other industry participants gained confidence that MAP policies would be uniformly adopted and enforced by their competitors.

76.    As the ATA's then-CEO and President Jay McAninch acknowledged the appointment of Defendants Cabela and Bass Pro Shops allowed the manufacturer and distributor "Board members to see that the box stores shared in our future and, more important, were serious about contributing to the success of the archery and bowhunting industry."

77.    With these retailers embedded in the ATA's leadership, the association began to act decisively. In the months following their appointment, the ATA launched a series of initiatives designed to promote the widespread adoption, implementation, and enforcement of MAP policies across the industry.

78. The ATA compiled and disseminated materials to assist members with MAP compliance, including sample MAP policies, enforcement strategies, and pricing templates. It also encouraged members to share MAP-related information and profit margins.

79. The ATA's initial coordination efforts were memorialized in a now-deleted communication dated December 31, 2014, titled "MAP: United We Stand, Divided We Fall." In this message to ATA members, McAninch openly acknowledged the ATA's intent to facilitate industry-wide MAP adoption as a solution to what he described as harmful retail price competition:

> I believe to deal with this MAP issue, our industry must hold an open, honest dialogue about it. Everyone must participate because if we don't address the damage to our business model, we risk losing in the long term the sustained growth we've enjoyed. Since this involves everyone the ATA is the right group to facilitate this discussion and provide the vehicle for the industry to unite behind constructive, positive changes.

> To ensure the industry addresses these issues, we've engaged the ATA Board of Directors; and the leaders of ARRO, NABA, NBS and Sports Inc. We've also included manufacturers and distributors who expressed interest in MAP. In the months ahead, we'll facilitate a dialogue that examines what our industry's business leaders think can and should be done about MAP. To that end, the ATA will offer our MAP policy as a template that companies can use as a tool if they take action.

> We can't solve industry problems until we involve everyone in a conversation that shares concerns and develops a course of action. This first step basically "turns on the lights" because it requires everyone to share what they think about this issue's impacts on our industry. Once we have a clear sense of what MAP is about for ATA members, we can start a process that deals with it.

80. In furtherance of its coordinated effort to standardize pricing across the Archery Products industry, the ATA developed a MAP policy for its members. This draft policy was designed "to protect our companies from state and federal legal actions, while clearly informing other companies of their unilateral policy on product pricing." In addition, the ATA created a

checklist of key considerations to guide members in "forming—and enforcing—a sound, effective MAP policy."

81.     At its January 2015 Trade Show, 60 ATA members, including manufacturers, distributors, and retailers attended a seminar hosted by the ATA that focused on creating and enforcing MAP policies. In a subsequent newsletter that summarized the seminar, APA stated: "If ATA members want to control the minimum advertised price (MAP) and/or the minimum resale price (MRP) of their products, each business must create its own policy statement, issue it to all resellers, and then enforce it consistently and forcefully with no negotiations."

82.     The ATA advised its members on how to develop "customized policies to protect each product's publicly advertised minimum price." These minimum prices, the ATA explained, should be enforced across all advertising platforms. The ATA emphasized that companies failing to establish and enforce MAP or MRP policies risked not only losing profits but also weakening the value of their brand.

83.     In a February 6, 2015 newsletter, the ATA expanded on the MAP training provided to members. The newsletter acknowledged that while the ATA could not set or enforce MAP or MRP policies itself—because doing so would violate antitrust laws—it could provide guidance and resources to help individual manufacturers develop and implement their own policies. This training built on a 2014 sample MAP policy provided by the ATA, which included a "three-step plan" designed to assist ATA-member manufacturers and distributors in tailoring and adopting their own MAP policies.

84.     In June 2015, Defendant Kinsey's announced the adoption of a new MAP policy. In a press release published in *Archery Wire*, the company stated: "Kinsey's stands behind

manufacturers in their implementation of minimum advertised pricing to protect the interests of their brands, as well as margin integrity within the retail network."

85.     The success of this industry-wide MAP initiative depended heavily on the active cooperation of Archery Product distributors and retailers. Since many Archery Product resellers source Archery Products from distributors or retailers rather than directly from manufacturers, MAP policies would only be effective if those distributors and retailers rigorously monitored and enforced the manufacturers' MAP policies.

86.     As part of the broader conspiracy to fix and stabilize prices of Archery Products, manufacturers reached agreements with distributors to assist in the enforcement of MAP policies. These agreements ensured that MAP violations would be policed not only by manufacturers but also by intermediaries in the supply chain. For example, in June 2015, manufacturer TenPoint Crossbow Technologies publicly praised Defendant Kinsey's for its role in MAP enforcement, stating: "Kinsey's has done a great job of backing TenPoint's enforcement of its MAP policy, thus strengthening the TenPoint brand as well as helping the retailers maintain a solid profit margin. This MAP enforcement is important in order to keep the retailer base, and archery as a whole, healthy."

87.     Another example of coordinated MAP enforcement across the supply chain is the policy implemented in 2017 by T.R.U. Ball Archery Releases and Axcel Archery Sights ("T.R.U."). T.R.U.'s MAP policy imposed penalties on violators at multiple levels of the distribution chain. For retailers who sold T.R.U. products, the policy included specific conditions and consequences for non-compliance, including:

> New MAP Violator:
> A warning will be issued. Violator will be evaluated in approximately two weeks to determine if they have raised prices to MAP levels.

Repeat MAP Violator:
First repeat infraction – Violators who have been notified that they are below MAP pricing within the last six months will be given a 48 hour warning to raise prices to MAP levels. Violators who have not raised prices to MAP levels after this time period will be placed on the T.R.U., Inc. Do Not Sell List, which asks each distributor to immediately block supply of product, for 30 days

Second repeat infraction – Violators who have been listed on the T.R.U., Inc. Do Not Sell List within the last six months who knowingly lower their prices below MAP level for a second time will be placed on the T.R.U., Inc. Do Not Sell List, which asks each distributor to immediately block supply of product, for 60 days.

Three or more repeat infractions – Violators who have been listed on the T.R.U., Inc. Do Not Sell List within the last six months who knowingly lower their prices below MAP level for more than two times will be placed on the T.R.U., Inc. Do Not Sell List, which asks each distributor to immediately block supply of product, for the greater of 60 days or until prices have been raised to MAP levels for at least 30 days.

Additional enforcement provisions applied to distributors who supplied T.R.U. Archery Products to downstream resellers, further extending the reach of the MAP policy throughout the supply chain:

Distributor Violators:
T.R.U., Inc. will be using contacts from around the United States to purchase products from sources who are known to be violating MAP levels.

First infraction – Distributors who are found to supply a company that is currently on the T.R.U., Inc. Do Not Sell List will be added to the T.R.U., Inc. Do Not Sell List for 30 days.

Second infraction – Distributors who are found to supply a company that is currently on the T.R.U., Inc. Do Not Sell List will be added to the T.R.U., Inc. Do Not Sell List for 60 days.

Third infraction – Distributors who are found to supply a company that is currently on the T.R.U., Inc. Do Not Sell List will be added to the T.R.U., Inc. Do Not Sell List indefinitely.

88.    This dual-level enforcement structure ensured that both retailers and distributors had strong incentives to adhere to MAP restrictions, further entrenching the industry-wide price-fixing scheme.

89.    Reflecting on the industry's coordinated efforts, one Archery Products retailer expressed hope that the ATA and its members would succeed in "establishing a uniform set of rules that would be enforced consistently across the entire industry."

### 3.    Defendants Intensify MAP Enforcement Efforts in 2016

90.    By 2016, Defendants' coordinated effort to fix, raise, maintain, or stabilize prices of Archery Products through MAP policies had gained significant traction. Reflecting on the prior year's efforts, the ATA acknowledged both progress and challenges, stating: "More than one year later, there's still good news and bad. However, the ATA and its member companies have worked tirelessly to discuss, craft and enforce MAP policies that could help manufacturers, retailers and the industry."

91.    The MAP policy momentum was evident at the 2016 ATA Trade Show in Louisville, Kentucky. There, ATA members emphasized the importance of industry-wide unity in adopting, implementing, and enforcing MAP policies. One participant remarked, "The archery industry is uniting as one, understanding that we are all in this together, and that that unity is ultimately what will help us grow." A presenter at the Trade Show, the president of an Archery Product retailer, stressed during a presentation on MAP policies that the industry must "educate our dealers about holding to the MAP as much as they can . . . [o]therwise [violators will] destroy the brick-and-mortar stores." He further identified ATA as the central mechanism for achieving industry-wide compliance, stating that ATA must "educate retailers and manufacturers about the importance of upholding MAP policies."

92.    Following the 2016 ATA Trade Show, the ATA published "ATA Members Weigh in on MAP." This article directed its members to contact the ATA "for resources about creating a

MAP policy for [their] company." The ATA also reminded its members that these resources were exclusive as a part of their membership.

93.    A few months later, in May 2016, the ATA convened a strategic planning session in Minneapolis, Minnesota, bringing together nearly 40 of its members. As a result of this session, the ATA's Board of Directors reinstated the Retail Council to "improv[e] the industry's archery and bowhunting markets." The reconstituted Council significantly expanded the influence of retailers within the ATA, granting them a more prominent role in shaping the organization's policies and decision-making processes.

94.    In 2017, The ATA expanded its influence over Archery Product retailers and distributors, and continued to promote MAP policies.

95.    In July 2017, while meeting at the headquarters of Defendant Hoyt, the ATA Board of Directors unanimously voted to add two seats for archery retailer trade associations: the National Archery Buyers Association ("NABA") and the Archery Range Retailers Organization ("ARRO"). ATA described this decision as a way to give these groups "a direct voice in ATA matters" and to "provide industry representatives from all areas more chances to work together to strengthen the industry."

96.    Industry leaders welcomed the decision. NABA President Gary Kinard expressed optimism that the association's seat on the Board would "improve communication between dealers and manufacturers." Similarly, ARRO Executive Secretary Deb Colgrove noted that the ATA had "been working to help retailers be more profitable" and hoped that ARRO's inclusion would "strengthen[] the relationship and communication between ARRO, ATA[,] and manufacturers."

97.    The day following the announcement, the ATA posted on its Facebook page a promotional message linking to a now-deleted article titled "MAP: What is it? Why Does it Exist?"

The article strongly encouraged manufacturers to adopt, implement, and enforce MAP policies, and urged retailers to advocate for MAP enforcement. The ATA advised retailers to "follow[] good MAP policies, which means those enforced by manufacturers," adding, "[w]hen you're part of the solution, you'll make more money." Retailers were further instructed: "If a manufacturer doesn't have a policy, or doesn't enforce its policy, call the company and express your concerns. Encourage them to work with the ATA to develop a MAP policy or improve their current policy."

98.    The ATA also outlined the broader benefits of MAP enforcement, stating that such policies "level the playing field for all retailers, and eliminate the 'race to the bottom' that would occur if retailers endlessly competed to reduce prices." The article further explained that MAP policies help retailers "stay in tune with the market and margin expectations," and that "if you understand and follow a manufacturer's MAP policy, you'll be better positioned to make more money and run a successful business." The ATA reiterated its commitment to supporting MAP enforcement, noting that it "works with manufacturers to establish and enforce good MAP policies" and offers multiple avenues for members to get involved.

99.    In October 2017, the ATA launched its "MAP Resource Library" exclusively for its members. As a part of this launch of the MAP Resource Library, ATA issued this press release:

> If Minimum Advertised Pricing concerns your business – and it should – the Archery Trade Association offers resources to help ATA members comply with MAP guidelines.

> ATA staff are compiling manufacturers' MAP policies and posting them in the Members-Only area of the ATA website. This MAP Resources Library helps retailers learn which manufacturers have MAP policies, and helps retailers to understand and comply with them. Several policies are already posted, and the ATA will add more as manufacturers provide them.

> If you're a manufacturer and need help monitoring how well retailers adhere to your MAP policy, the ATA can help you, too. MAP policies are only effective if they're enforced, but monitoring and enforcing them can be challenging. To help, ATA has secured special discounts with firms that monitor and enforce MAP policies. These discounts are available only to ATA-member manufacturers.

The ATA has asked all ATA-member manufacturers to provide their policies so they can be included in the MAP Resource Library. If your company has a MAP policy, or if you have questions, contact Wendy Lang, ATA membership manager, at wendylang@archerytrade.org. To capitalize on these ATA-member benefits, join the Archery Trade Association today.

100.    Around the same time the ATA launched its MAP Resource Library, it also created a dedicated webpage promoting MAP policies. Though since deleted, the page described MAP enforcement as a mechanism to ensure that "all retailers compete fairly and evenly on service instead of price." The ATA further emphasized that "[r]etailers are responsible for knowing MAP policies and adhering to them," reinforcing the expectation of industry-wide compliance.

101.    A month after introducing the MAP Resource Library, the ATA launched ATA Connect. In a social media post promoting ATA Connect, the ATA stated: "Retailers, are you looking for a place to talk shop? Check out ATA Connect, a new forum just for industry professionals," linking to a now-deleted article on the ATA website, titled "ATA Retailers: Explore ATA Connect [to] Find Business Solutions."

102.    Throughout the Conspiracy Period, the ATA directed its members to use ATA Connect as a platform for coordinating on MAP-related issues. In 2019, for example, the ATA updated its website to encourage members to "discuss MAP with [their] peers" via ATA Connect.

103.    ATA also created the Retail Growth Interact and the My ATA Network channels on ATA Connect. Both channels encouraged Manufacturer, Retailer, and Distributor Defendants to covertly exchange competitive sensitive information directly with competitors.

104.    The ATA promoted ATA Connect as a space to "find solutions that boost business and benefit the industry by tackling topics like MAP policies" and specifically guided its Retailer members to the Retail Growth Interact Community within ATA Connect to discuss "topics like MAP policies" in what it described as "a safe online space."

105.   The ATA also formally introduced and endorsed the use of MAP enforcement software developed by co-conspirators TrackStreet and Oris in 2017.

106.   To incentivize adoption of this software, the ATA offered exclusive discounts to its members for Defendants TrackStreet and Oris. The ATA promoted Defendants TrackStreet and Oris as offering advanced digital tools, such as "web crawlers" and other high-tech monitoring systems, capable of scanning the internet to detect MAP violations. According to the ATA, these software providers could "identify violators, uncover fictitious seller names, and track them as they move across platforms to undercut our members."

107.   Defendants TrackStreet and Oris both offered digital platforms specifically designed to monitor and enforce pricing policies, including MAP compliance. In a now-deleted promotional image hosted on the ATA's website, Defendant Oris advertised its services as providing "actionable insights that preserve pricing integrity," claiming to help manufacturers "protect their brands" across industries ranging from outdoor gear to housewares.

108.   The ATA made clear that enforcement was essential to the success of MAP policies. On its website, it advised manufacturer members: "MAP policies are only effective if they're enforced, but monitoring and enforcing them can be challenging. To help, ATA has secured special discounts with firms that monitor and enforce MAP policies. These discounts are available only to ATA-member manufacturers."

109.   The services offered by Defendants Oris and TrackStreet can cost over $1,000 per month without the ATA-member discount. Archery Products manufacturers, retailers, distributors, and other industry participants would have little incentive to incur such high costs unless these services directly contributed to increased profitability. In this case, profitability was achieved by

enabling higher retail prices through MAP enforcement and by penalizing those who attempted to compete on price.

110.    In 2019, the ATA consistently emphasized the critical importance of MAP enforcement and the need for a unified, collective approach through various posts, articles, and podcasts. For example, on January 12, 2019, the ATA shared a tweet and Facebook post likening MAP enforcement to "hunting coyotes," noting that "the season never ends."

111.    The social media posts linked an article titled "Effective MAP Programs Mean Nonstop Enforcement." In the article, the ATA encouraged retailers and distributors to report MAP violations to manufacturers, urging them to include as many details as possible. The article emphasized that "communication and teamwork" are essential, noting: "Enforcing MAP will never get easier. That's why it's so important for ATA members to collaborate whenever possible."

112.    The ATA continues to maintain webpages discussing MAP policies and providing a range of resources that support coordination among the other Defendants.

### 4.    MAP Enforcement Bolsters Profit Margins and Prices of Archery Products

113.    By 2019, Defendants were openly touting the effectiveness of their MAP enforcement efforts, celebrating the industry-wide adoption of such policies as the key to higher prices and increased profit margins. In a 2019 ATA article, Ben Summers of T.R.U. Ball Archery acknowledged that "good MAP policies and relentless enforcement played a big part in the company's 'really high' sales the past year," illustrating the direct financial benefits of the coordinated pricing regime.

114.    The ATA continued to reinforce the need for strict MAP enforcement and collective discipline against those who threatened the arrangement by offering discounted prices. The ATA Director of Industry Relations Kurt Smith emphasized the importance of competitor coordination

to sustain elevated price levels: "The big thing will always be communication and teamwork," noting that "[e]nforcing MAP will never get easier. That's why it's so important for ATA members to work together as much as possible."

115.    On March 20, 2019, the ATA featured Defendant TrackStreet's Ryan Erickson on its official podcast, *Beyond the Bow*, in an episode titled "MAP Policies & Enforcement." The discussion was hosted by Kurt Smith. Smith introduced MAP policies as "probably one of the most talked about topics in the archery industry." Throughout the episode, Erickson repeatedly emphasized the importance of achieving a critical mass of manufacturers committed to adopting, implementing, and enforcing MAP policies. He remarked that "[e]ach individual brand has to be on the same page," and, quoting Benjamin Franklin, stated "[w]e must all hang together or, most assuredly, we shall all hang separately." Later, he added: "Nobody wants to be the first soldier through the wall… they tend not to turn out too well. But as soon as a couple big brands hop on, that provides umbrella coverage for the rest of the brands to move forward." Erickson also praised the ATA's leadership in this effort, stating, "The work that the ATA has done for the industry… is unparalleled in terms of the efforts they are making."

116.    That same year, Defendant Kinsey's publicly detailed the enforcement mechanisms behind its MAP policy, stating: "When someone breaks the rules, they lose the ability to buy that product from us. They also can't buy it online or through the manufacturer because we work closely with our vendors to build a 'do-not-sell' list." Defendant Kinsey's further warned retailers: "If your company has fallen below MAP prices, you will be restricted from purchasing these products from Kinsey's South effective immediately."

117.    Defendants also used trade publications and statements issued through the ATA to reaffirm their commitment to MAP enforcement. These public declarations served as signals to

their competitors and would-be competitors, reinforcing mutual expectations of compliance and thereby solidifying the conspiracy. Over time, this coordinated messaging helped normalize the price-fixing agreement as standard practice within the archery industry.

118.    For example, the August 2019 issue of *Inside Archery* reported: "Kinsey's is using its far-reaching influence to help enforce MAP policy. This effort is also geared towards helping dealers and strengthening the industry at large."

119.    In that article, Justin Gorman, Kinsey's Director of Sales, reaffirmed the company's active role in MAP enforcement: "We work closely with our vendor partners and retail partners to monitor and enforce MAP policy"; and "There are a lot of methods out there, and there really is no simple solution, but by working together, we have the ability to bring positive change to the industry." Gorman underscored the importance of collective action, adding: "Everyone needs to pull their own weight, but we are doing all we can to help protect the honest shops that don't violate MAP, which are the shops that actually get hurt when someone else breaks the rules."

120.    In a March 2020 interview with *Inside Archery*, PSE General Manager David Kronengold stated: "The industry is in a hard place, but we are not going to wait for anyone else to fix it for us. We are going to make it part of PSE's business strategy to drive improvement and fix everything we can. And we are doing all of this while fully acknowledging that if we are successful, then we are also benefiting our competitors."

121.    In a December 2020 interview with *Inside Archery*, Phaen Pittman, Manager of retailer Performance Archery, stated: "The purchasing side is where we put a major emphasis on who we do business with and why. We're constantly researching to find the best products, backed by companies with strong MAP policies and good dealer margins."

122.    Further evidence of industry coordination came in a now-deleted 2021 post on the ATA's website, authored by MWS Associates, Inc. Vice President Bill Goodreau and President Kurt Bassuener. In that post, Goodreau and Bassuener emphasized that despite competition among ATA members, cooperation remained essential to the success of the industry as a whole. They wrote:

> We're all competitors, and we compete against each other throughout the season and the years. But we must grow the [participation] numbers in the industry, and to do that we must work together. Realistically, the ATA does so much for the growth and health of the industry, and I think that largely goes unrecognized. Although we're all competitors in the industry, we all have the same goal, and that's to help the industry succeed. The ATA works on that, and reminds us to see the bigger picture.

123.    These coordinated public statements, disseminated repeatedly through industry channels, both reinforced the MAP conspiracy and served to maintain compliance among existing participants, while encouraging new participants to join under the assurance of industry-wide enforcement.

**5.  Defendants' Price-Fixing Conspiracy is Ongoing**

124.    Defendants' conspiracy to fix prices through the widespread adoption, implementation, and enforcement of MAP policies on Archery Products continues to this day.

125.    The ATA remains actively involved in facilitating and supporting this unlawful conduct. It continues to offer assistance to its manufacturer members in "developing a MAP policy," publicly "advocates" for MAP enforcement on behalf of its members, and endorses MAP practices across the industry. The ATA also promotes tools and services to help members enforce MAP policies, including offering "discount programs" for outside vendors that use web crawlers and other advanced software to detect online MAP violations.

126.    Defendants and their co-conspirators continue to publish and enforce MAPs, including by advertising MAPs Archery Products in trade publications such as *Inside Archery*. They also continue to send signals to one another reinforcing their ongoing commitment to maintaining artificially inflated prices. For example, in both the January 2023 and January 2024 issues of *Inside Archery*, Steve Greenwood, General Manager of Victory Archery, reaffirmed the company's MAP enforcement efforts, stating: "We police MAP 24/7."

127.    The anticompetitive effects of this ongoing conspiracy persist. Consumers of Archery Products today continue to pay inflated prices that are the direct result of Defendants' coordinated price-fixing agreement.

**D.  Defendants' MAP-Based Conspiracy is a Per Se Violation of Antitrust Laws**

128.    Courts have consistently held that agreements among horizontal competitors to fix, raise, maintain, or stabilize prices are per se unlawful under the Sherman Act. Defendants here entered into precisely such an agreement: colluding to fix and stabilize prices for Archery Products through the widespread adoption, implementation, and enforcement of MAP policies. These policies have caused consumers to pay artificially inflated prices and have delivered supra-competitive profits to Defendants.

129.    Industry-wide MAP policies suppress competition and drive-up retail prices two ways. First, by preventing retailers from publicly advertising lower prices, MAPs diminish the incentive to compete on price, as discounted prices no longer attract additional customers. Second, even when limited discounting occurs, MAPs establish an artificially high starting point for price negotiations, ensuring that final transaction prices remain higher than they would in a truly competitive market.

130.    Defendants' collective enforcement of MAP policies thus constitutes a horizontal agreement to fix, raise, and maintain the retail prices of Archery Products sold across the United States. The ATA itself acknowledges the anticompetitive impact of these policies. According to the ATA, MAP policies are intended to "ensure all retailers compete fairly and evenly on service instead of price," and "eliminate the 'race to the bottom' that would occur if retailers endlessly competed to reduce prices." The ATA has further claimed that MAPs "help small businesses compete and sell on service and value, rather than waging price wars."

131.    Consumers have long recognized that these artificially sustained prices are excessive. As far back as 2017, published reports described compound bow prices as "obscene," "out of touch," and "insane." One article quoted a bow manufacturer's founder who observed: "Used to be dealers were happy to make $150 on a bow. Now many of them want $250 or more. It's tough. The whole industry is trying to figure out what to do next." These statements confirm that retail prices have been pushed well beyond competitive levels due to coordinated pricing practices.

## CLASS ACTION ALLEGATIONS

132.    Plaintiffs bring this action both on behalf of themselves, and as a class action pursuant to Federal Rules of Civil Procedure 23(a), seeking damages (the "Nationwide Damages Class") and (b)(3), seeking injunctive relief (the "Nationwide Injunctive Relief Class"), on behalf of the following class:

> All persons and entities residing in the United States or its territories that directly purchased Archery Products manufactured or distributed by an Archery Trade Association member, at any point between January 1, 2014, and the present (the "Class Period").[2]

---

[2] Excluded from the Class are Defendants, their parent companies, subsidiaries, and affiliates, any co-conspirators, all governmental agencies, and any judges or justices assigned to hear any aspect of this action.

133.    *Numerosity*. Plaintiffs do not know the exact number of Class members because such information is in the exclusive control of Defendants and co-conspirators. Due to the nature of the trade and commerce involved, and the popularity of Archery Products, there are most likely hundreds of thousands of Class members, geographically dispersed throughout the United States, such that joinder of all Class members is impracticable.

134.    *Typicality*. Plaintiffs' claims are typical of the claims of the Class in that he and Class members all purchased Archery Products subject to a MAP. All Class members were damaged by the same wrongful conduct of Defendants and their co-conspirators as alleged herein, and the relief sought is common to the Class.

(a) *Commonality*. Questions of law or fact that arise from Defendants' anticompetitive conduct are common to the Class, including, but not limited to, the following: Whether Defendants and co-conspirators engaged in a contract, combination, and/or conspiracy to fix, raise maintain, or stabilize prices of Archery Products sold in the United States;

(b) Whether Defendants' and co-conspirators' conduct caused prices of Archery Products sold in the United States to be sold at artificially high and supra-competitive levels;

(c) Whether Plaintiffs and the other Class members were injured by Defendants' and co-conspirators' conduct and, if so, the appropriate class-wide measure of damages for Class members; and

(d) The scope of any injunctive relief to which Plaintiffs and other Class members are entitled.

135.    *Predominance*. These and other questions of law and fact are common to the Class and predominate over any questions affecting only individual Class members. In addition, Defendants have acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

136.    *Adequacy*. Plaintiffs will fairly and adequately represent the interests of the Class and have no known conflict with any other members of the Class. Further, Plaintiffs have retained competent counsel experienced in antitrust, class action, and other complex litigation.

137.    *Superiority*. A class action is superior to the alternative of individual actions for the fair and efficient adjudication of this controversy. There will be no material difficulty in the management of this action as a class action. Prosecution as a class action will eliminate the possibility of repetitive litigation, and thus costly and duplicative efforts and expenses. In the same vein, proceeding as a class action has the benefit of providing injured persons with a method of obtaining relief for their claims that might not be economically feasible. In addition, the prosecution of separate actions would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

## RELEVANT MARKET

138.    Defendants' price fixing agreement is unlawful under the *per se* standard, which does not require relevant market definition.

139.    To the extent that definition of a relevant geographic market is legally relevant in this action, the geographic market is the United States and its territories.

140.    To the extent that definition of a relevant product market is legally relevant in this action, it is Archery Products. Archery Products refers to products used by consumers for bowhunting or archery. For purposes of this action, Archery Products consists of five main product

markets, submarkets, or cluster markets: (1) bows—including compound bows, recursive bows, longbows, and crossbows—and their components; (2) arrows (minus the arrowhead) and their components, including the shaft, fletching, and nock; (3) arrowheads (or arrowpoints) including broadheads and field points; (4) targets, including bag targets, foam targets, and 3D targets; and (5) accessories, such as bow cases, arrow quivers, sights and scopes, and stabilizers. According to the ATA, in 2020, "[t]he US [had] 9.9 million bowhunters, 17.6 million recreational archers and 5.4 million competitive archers . . . ." This equates to roughly 13% of the U.S. population over the age of thirteen.

141.    Because Defendants conspired to raise prices through the adoption, implementation, and enforcement of MAPs on the Archery Products market in the United States as a whole, it is appropriate to analyze the competitive effects of the MAP policies on this market as a whole. That is, grouping these products into a single product market allows for an efficient analysis of the competitive effects of the industry-wide MAPs without any analytical difference.

142.    At all relevant times, Defendants and their co-conspirators have collectively possessed market power at each and every level of the United States market for Archery Products, including at the manufacturing, distribution, and retail sales levels. That is, they maintained the ability to raise prices significantly above competitive levels profitably, without losing a commensurate number of sales.

143.    Specifically, a hypothetical firm or cartel that controlled a substantial share of the market for Archery Products, as Defendants and their co-conspirators do, could profitably impose a small but significant non-transitory increase in prices for Archery Products. Due to the conduct challenged herein and other factors, consumers would not be able to defeat such price inflation by shifting to other companies or products.

## FRAUDULENT CONCEALMENT AND TOLLING

144.    Any applicable statute of limitations has been tolled by Defendants' knowing and active concealment of their unlawful conduct. Throughout the Class Period, Defendants affirmatively and fraudulently concealed their unlawful and anticompetitive conduct.

145.    Consumers generally are unaware of MAP strategies and how the MAP is set through the ATA.

146.    Plaintiffs had no actual or constructive knowledge of Defendants' anticompetitive scheme. And Plaintiffs and the Class did not discover, nor could they have discovered through the exercise of reasonable diligence, the existence of the conduct alleged until shortly before filing this Complaint.

147.    Further, the very nature of Defendants' conduct was secret and self-concealing inasmuch as Defendants hid their horizontal price-raising agreement and simply called them "MAPs," when in fact, they were collusively established "policies" aimed at artificially raising prices and restricting competition at the retail level.

148.    For instance, Defendants' conspiratorial campaign to adopt, implement, and enforce industry-wide MAPs began and was coordinated behind the ATA's closed doors. These meetings, including the ATA's annual Trade Shows, were closed to consumers.

149.    Similarly, and also as noted above, sometime after June 2021, the ATA began scrubbing its website of potentially problematic references to its role in coordinating the adoption, implementation, and enforcement of industry-wide MAPs.

### CLAIMS FOR RELIEF

### COUNT I

### Violations of Sections 1 and 3 of the Sherman Act
### Section 4 and 16 of the Clayton Act
### (15 U.S.C. §§ 1, 3, 15(a), 26)

150.    Plaintiffs hereby restate Paragraphs 1 through 131 of this Complaint as if fully set forth herein.

151.    Beginning no later than January 1, 2014, and continuing to the present, Defendants and their co-conspirators have engaged in a conspiracy and agreement in restraint of trade in violation of Section 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

152.    Defendants' and their co-conspirators' cartel, chiefly orchestrated through the ATA, was designed to artificially raise, fix, maintain, or stabilize prices at a supracompetitive level and eliminate horizontal price competition for Archery Products at the retail level in the United States.

153.    The primary means by which Defendants and their co-conspirators operate the cartel is through their agreement for the widespread adoption, implementation, and enforcement of MAP policies, which, in practice, set an artificial price floor and increase the prices of Archery Products. The agreed-upon MAPs represented a drastic change in how Archery Products were sold in the United States.

154.    Defendants and their co-conspirators promulgated and enforced the agreements between and among themselves by exchanging competitively sensitive information such as prices, output, supplies, costs, and purchasing and sales strategies.

155.    Defendants' and their co-conspirators' actions did, in fact, raise, fix, maintain, or stabilize prices of Archery Products at a supracompetitive level, eliminated or suppressed

competition among manufacturers and retailers for sales of Archery Products in the relevant market.

156.    Due to the presence of horizontal restraints, this Complaint presents allegation of violations of the federal antitrust laws that are illegal per se.

157.    In the alternative, Plaintiffs allege Defendants and their co-conspirators have engaged in a violation of Sections 1 and 3 of the Sherman Act under either a quick look or fully-fledged rule of reason analysis.

158.    As a result of Defendants' and their co-conspirators unlawful conduct, retail prices for Archery Products subject to agreed-upon MAPs were fixed, raised, maintained or stabilized in the United States.

159.    As a result of Defendants' and their co-conspirators' unlawful conduct, Plaintiffs and the other members of the Class have been injured in that they have paid more for Archery Products than they otherwise would have paid in the absence of Defendants' anticompetitive conduct.

160.    Plaintiffs seek injunctive relief, treble damages, and attorneys' fees and costs, and a permanent injunction enjoining Defendants from entering into similar to the same agreements in the future, by and through Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15(a), 26).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs prays that the Court enter judgment on their behalf and on behalf of the Class herein, adjudging and decreeing that:

A.  This action may proceed as a class action, with Plaintiffs as the designated Class representatives and their counsel as Class Counsel;

B.  Defendants and their co-conspirators have engaged in a contract, combination, and conspiracy in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3), and

that Plaintiffs and the members of the Class have been injured in their business and property as a result of Defendants' and their co-conspirators' violations;

C. Plaintiffs and the members of the Class recover damages sustained by them, as provided by the federal antitrust laws, and that a judgment in favor of Plaintiffs and the Class be entered against Defendants in an amount to be trebled to the extent such trebling is permitted pursuant to such laws;

D. Plaintiffs and the members of the Class recover restitutionary relief to the extent such relief is afforded by any of the aforementioned laws;

E. Defendants, their subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents, and employees thereof and all other persons acting or claiming to act on their behalf be permanently enjoined and restrained from continuing and maintaining the combination, conspiracy, or agreement alleged herein;

F. Plaintiffs and the members of the Class be awarded pre- and post-judgment interest, and that such interest be awarded at the highest legal rate from and after the date of service of the initial complaint;

G. Plaintiffs and the members of the Class recover their costs of this suit, including reasonable attorneys' fees and expenses, including costs of experts; and

H. Plaintiffs and the members of the Class receive such other or further relief as may be just and proper.

## DEMAND FOR TRIAL BY JURY

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs hereby demand a trial by jury on all issues so triable.

**LITE DEPALMA GREENBERG & AFANADOR, LLC**

Respectfully submitted,

Dated: July 29, 2025

*/s/ Laura K. Mummert*
Laura K. Mummert
Steven J. Greenfogel
1515 Market Street, Suite 1200
Philadelphia, PA 19102
(267) 314-7980
lmummert@litedepalma.com
sgreenfogel@litedepalma.com

Joseph J. DePalma*
Bruce D. Greenberg*
Catherine B. Derenze*
570 Broad Street, Suite 1201
Newark, NJ 07102
(973) 623-3000
jdepalma@litedepalma.com
bgreenberg@litedepalma.com
cderenze@litedepalma.com

*Attorneys for Plaintiffs and the Putative Class*

*\*Pro Hac Vice Forthcoming*